In the

# United States Court of Appeals

## For the Seventh Circuit

No. 10-2083

DAVID J. SPIVA,

*Plaintiff-Appellant*,

*v.*

MICHAEL J. ASTRUE, Commissioner
of Social Security,

*Defendant-Appellee*.

Appeal from the United States District Court
for the Eastern District of Wisconsin.
No. 09-C-178—**J.P. Stadtmueller**, *Judge*.

ARGUED NOVEMBER 9, 2010—DECIDED DECEMBER 6, 2010

Before POSNER, TINDER, and HAMILTON, *Circuit Judges*.

POSNER, *Circuit Judge*. In *Parker v. Astrue*, 597 F.3d 920 (7th Cir. 2010), we criticized the handling of social security disability claims in the following respects: (1) opinions of administrative law judges denying benefits routinely state (with some variations in wording) that although "the claimant's medically determinable impairments could reasonably be expected to produce

the alleged symptoms, . . . the claimant's statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely credible," yet fail to indicate which statements are not credible and what exactly "not entirely" is meant to signify; (2) many of the Social Security Administration's administrative law judges seem poorly informed about mental illness; and (3) in defiance of the principle of *SEC v. Chenery Corp.*, 318 U.S. 80, 87-88 (1943), the Justice Department's lawyers who defend denials of disability benefits often rely heavily on evidence not (so far as appears) relied on by the administrative law judge, and defend the tactic by invoking an overbroad conception of harmless error. See also, e.g., *Larson v. Astrue*, 615 F.3d 744, 749, 751 (7th Cir. 2010) (misunderstanding of mental illness; *Chenery* violation); *McClesky v. Astrue*, 606 F.3d 351, 352, 354 (7th Cir. 2010) (credibility boilerplate; *Chenery* violation); *Kangail v. Barnhart*, 454 F.3d 627, 629 (7th Cir. 2006) (misunderstanding of mental illness); *Mendez v. Barnhart*, 439 F.3d 360, 362 (7th Cir. 2006) (*Chenery* violation); *Ryan v. Commissioner of Social Security*, 528 F.3d 1194, 1199-1201 (9th Cir. 2008) (misunderstanding of mental illness); *Kohler v. Astrue*, 546 F.3d 260, 268-69 (2d Cir. 2008) (same); *Haga v. Astrue*, 482 F.3d 1205, 1207-08 (10th Cir. 2007) (*Chenery* violation); *Robbins v. Social Security Administration*, 466 F.3d 880, 883-85 and n. 2 (9th Cir. 2006) (credibility boilerplate).

The administrative law judge found that the applicant in this case, David Spiva, "has the following severe combination of impairments [she probably meant to write 'combination of severe impairments']: mood disorder,

schizophrenia, dysthymia [a form of depression with milder symptoms than major depressive disorder], psychosis, depression, alcohol and cannabis abuse, and attention deficit disorder." Schizophrenia is a psychosis, and dysthymia a form of depression, and depression a mood disorder, so what the administrative law judge intended by adding depression, psychosis, and mood disorder to the list of Spiva's impairments is, like much else in her opinion, unclear.

She concluded that Spiva was not totally disabled, because he could perform the last job he had held, which had been at Walmart, and lots of other jobs (unspecified) as well. She said "there was reference to malingering as an issue"; Spiva had been found to be "evasive during his consultative evaluation"; there were references to his "not taking medication as prescribed"; he had admitted being "able to do simple household chores and interact[] with family members," including "babysitting for his child while the mother worked"; and he had "moved to Milwaukee in July 2006 because the child's mother needed help." That's it—and is a remarkably sparse summary of a rich record.

Spiva was working at a Walmart store in Mississippi when in 2004, at the age of 28, he checked himself into a psychiatric clinic. He told William Turner, his attending physician, that he had suffered from "horrible thoughts" since childhood and had attempted suicide with rat poison in his teens. When he was a child his father had died from a gunshot wound to the head and his mother had beaten him. He had served time in prison

on drug charges. He had left his home in Milwaukee (where people told him he was "crazy"), hoping to "get a fresh start" in the South. But although he had found work shelving goods and loading trucks at Walmart, "thoughts of harming himself and thoughts of harming other people" continued to haunt him. He reported "having spirits within him from other people that are evil spirits." He said "he had been very depressed and anxious. He had decreased appetite, decreased sleep and decreased energy. He had had auditory hallucinations, hearing 'spirits.' [He] stated that his thoughts were not his, that his thoughts were being controlled by other people's spirits. He stated that he always had thoughts of wanting to hurt people." Dr. Turner tentatively diagnosed Spiva as having a psychotic disorder, a mood disorder, and a personality disorder.

After a few days on Geodon, a drug for treating schizophrenia, and Lexapro, a drug for the treatment of major depressive disorder, Spiva was discharged with a prescription for another antidepressant drug, Zoloft.

Five months later he checked himself back into the facility. He had stopped taking Zoloft because it wasn't working. His condition had worsened. He reported that "evil spirits" were "after him," that sometimes he could control the spirits and at other times they controlled him, and that he often thought about hurting his family. He denied having visual hallucinations—he would admit only to auditory ones—yet also said that he was seeing the spirits, though not with his "physical eye." He was prescribed both antipsychotic and antidepressant

drugs (Abilify, Effexor, Cymbalta, Trazodone, and again Geodon). After a week in the facility Spiva was discharged, but he didn't return to work because he "wasn't functioning right."

Dr. Shannon Johnson of the clinic opined that as long as Spiva stayed on the drugs prescribed for his mental illnesses and kept his appointments with mental-health professionals, he would be able to maintain "steady, gainful employment." The two mental-health professionals whom the Mississippi Disability Determination Services (a state agency that works with the Social Security Administration) asked to evaluate Spiva's mental condition agreed that he was capable of working full time. One of them, William Osborn, a psychologist, could not decide whether Spiva was psychotic, in part it seems because he was uncommunicative, refusing for example to discuss his previous diagnoses of and treatments for mental illness. Osborn concluded that probably Spiva could "perform routine repetitive tasks, interact with coworkers, receive supervision, and maintain concentration and attention." The other consultant, however, Janise Hinson, while she agreed that Spiva could return to work, thought his vocational options might be limited by his difficulties in concentrating and in interacting with people (maintaining "socially appropriate behavior"), including both members of the general public and supervisors and coworkers, and in adhering to basic standards of cleanliness and neatness.

In 2006, no longer working, Spiva returned to Milwaukee to help a woman with whom he had had a child. He

has had no fixed residence after returning from the South, but has moved from relative to relative, each of whom would eventually "put him out" because "I [Spiva] ended up losing control of my thoughts." (An aunt with whom he had lived in Mississippi had said: "He is lovable one day, but displays a lot of anger and hate the next day . . . . He doesn't talk like himself . . . . He has a lot of hate and anger in him, and it's hard to get to his head.") He laughs at inappropriate times, and at times exhibits uncontrollable rage. At the time of the disability hearing he was living with a cousin who wanted him to leave; he may be running out of relatives to live with.

He was admitted to a psychiatric clinic in Milwaukee in 2006, where he "talked a lot about spirits" (in typical schizophrenic fashion he believes that people, as well as spirits, insert unwanted thoughts into his brain telepathically) and told a doctor that he didn't want to live any more. He returned to the clinic the following year and this time was referred to a hospital for treatment. He told hospital personnel that there was "evil in me" and "around me" and made "vague" threats that he would harm himself and others. He said that he and his daughter (a child of nine) share the same spirit; since the spirit tells him to do evil things, it may tell the daughter to do evil things to him. He had what one medical examiner called delusions of persecution and of "alien control." When his "walls are not up," spirits invade his body. He is "willing to cooperate [with mental health professionals] but is fearful of groups of people confronting him." His thinking is "nihilistic and grandiose."

In a 2007 hospitalization he "came in with vague complaints. 'Burning inside that feels like anger that needs to explode.'" He was discharged two weeks after being admitted, with a diagnosis of an unspecified mood disorder. At the time he was taking several medications, including the mood-stabilizer Depakote and the antidepressant Trazodone.

Spiva was the only person to testify at his disability hearing. He testified that he was unable to work because he was afraid he might have to be "around somebody negative" and would "have an evil thought of hurting them"; "all I think about is bad stuff and doing bad." He added that because of his medications he had trouble sleeping and as a result spent most of the day groggy and irritable. But he had babysat for his daughter and sometimes he would help out at a friend's day-care facility, and in the past month he had attended two parties hosted by a cousin with whom he was then living.

Without some analysis, nowhere to be found in the administrative law judge's opinion, it is difficult to understand her determination that Spiva can do the kind of work he did at Walmart. An employee who stocks shelves at a Walmart or a Walgreens or a Costco or a Treasure Island—large stores with limited sales personnel—has to be able to interact with customers; the employees who stock the store's shelves are often the only employees whom a customer can find to ask about the location of specific items. A psychotic person busy trying to cope with evil spirits and evil thoughts is not likely to be employable as a shelf stocker in such a store.

Maybe he can do other jobs but the administrative law judge didn't discuss any other jobs that Spiva might be able to do. She seems to have thought that because his job with Walmart involved unloading trucks as well as stocking shelves it was a simple, unskilled, routine job that anyone could do.

That may be an accurate description of unloading trucks at a loading dock (though there would still be a question whether Spiva can work under supervision), but that was only part of his job. He did testify that his job at Walmart "started off like stocking foods and stuff and I guess like loading trucks . . . . I was working at the store, like the stocking stuff and then it changed like to stocking the trucks." So maybe loading trucks at a Walmart or similar store can be a full-time job, but this possibility was not explored at the hearing and the administrative law judge described Spiva's job simply as "stocker work."

An administrative law judge is required to determine (at what is called "stage four" of the Social Security Administration's disability algorithm) whether, despite his limitations, the applicant for benefits can do his previous work. 20 C.F.R. § 404.1520(a)(4)(iv), (f); *Castile v. Astrue*, 617 F.3d 923, 925 (7th Cir. 2010). If so, that's the end of the case. And that's the point at which the administrative law judge stopped in this case. She made no finding concerning what jobs Spiva might be capable of doing besides his previous one (which was never precisely defined) and how many such jobs might be available in the Milwaukee area.

The grounds, which we summarized earlier, on which the administrative law judge based her determination that Spiva's testimony was "not entirely credible" are inconsistent with the record. Her remark about malingering was based on a statement by a doctor who at first thought Spiva might be malingering but later decided that he was not. The government's brief cites what it describes as additional evidence of malingering, but as nearly as we can determine the evidence is a statement by a doctor who expressed regret that Spiva wasn't willing to share with him the details of the family feud that had driven him to seek treatment.

The references in the treatment notes to Spiva's being vague or evasive when questioned about his illness could be evidence of malingering, but equally could reflect the effects of his psychotic mentation. Nothing in the treatment notes suggests that Spiva was being deliberately or strategically vague or evasive. "Burning inside that feels like anger that needs to explode" may be vague, but it is consistent with Spiva's other psychiatric symptoms. His refusal at the time of his 2007 hospitalization to allow the hospital "to contact anyone about him," is "evasive" in a literal sense but also consistent with paranoia.

The administrative law judge's reference to Spiva's failing to take his medications ignores one of the most serious problems in the treatment of mental illness—the difficulty of keeping patients on their medications. The drugs used to treat schizophrenia, for example, can make a patient feel drowsy and stunned. See, e.g., National

Institute of Mental Health, *Schizophrenia* 9 (2009), www.nimh.nih.gov/health/publications/schizophrenia/ schizophrenia-booket-2009.pdf (visited Nov. 14, 2010); John M. Grohol & National Institute of Mental Health, "Schizo-phrenia and Psychosis Treatment: Part 2, Length of Treat-ment and Side Effects," *Psych Central* (Nov. 12, 2006), http://psychcentral.com/disorders/schizophrenia/schizo_ treatment2.htm (visited Nov. 14, 2010). As a result he may be unwilling to keep taking them. The administrative law judge also ignored Spiva's testimony that he can't afford all the medications prescribed for him because he has no health insurance. And she ignored the finding that Spiva had scored only 20 on the "Global Functioning Assessment" scale (which runs from 0 to 100), a score that indicates (so far as bears on this case) "some danger of hurting himself or others."

The government's brief points out that all the medical professionals who have dealt with Spiva believe that he's capable of working full time. Yet the administrative law judge mentioned none of this evidence. The brief argues that if she had, her finding that Spiva is not totally disabled would be solidly grounded. This ignores the fact that she made an explicit finding that Spiva's "mental impairments moderately limit his social func-tioning and concentration/persistence/pace." She added, it is true, that his impairments "only mildly limit his activities of daily living," and this is relevant because the mental and physical capabilities that a person employs in his nonworking hours are relevant to his ability to work. But an ability to engage in "activities of daily living" (with only mild limitations) need not

translate into an ability to work full time. In this case it may mean nothing more than that Spiva can survive outside a mental institution or halfway house. Whether he can work full time as a "stocker"—the only type of job that the administrative law judge mentioned—is the question, and she offered no basis for her answer. No vocational expert, who might have been able to infer from Spiva's limitations what jobs he could do, testified. And the only activity of daily living to which the administrative law judge referred was babysitting, from which an ability to work full time could not be inferred, as we held in *Gentle v. Barnhart*, 430 F.3d 865, 867-68 (7th Cir. 2005). She didn't mention the evidence that Spiva's performance of household chores was incompetent; as the aunt with whom he had lived for a time stated, he needed help with everything because "his mind runs a lot."

The basis for the administrative law judge's finding that Spiva's mental impairments limit his social functioning must have been (though she didn't say so) Janise Hinson's determination that Spiva is capable of interacting with coworkers and supervisors on "a limited basis." The question is whether that "limited basis" is nevertheless consistent with his being able to work full time. The administrative law judge did not address that question, for when she expressed concern with Spiva's credibility and concluded that he could do his old job at Walmart she made no mention of his mental impairments. She may have forgotten her earlier finding or changed her mind; who knows?

It is not obvious that a person who hears evil spirits can respond to customers' requests for help in finding particular items that they want to buy, which is a component of the job of stocking shelves in a retail store. Hinson opined that Spiva can maintain his concentration for two hours at a time; whether, given his psychoses and his attention deficit disorder, he could maintain concentration for an entire workday is unknown. Because he was unrepresented by counsel—and mentally impaired to boot—the administrative law judge was supposed to try by questioning him to obtain all information relevant to his claim, *Nelms v. Astrue*, 553 F.3d 1093, 1098 (7th Cir. 2009); *Thompson v. Sullivan*, 933 F.2d 581, 585-86 (7th Cir. 1991); *Moran v. Astrue*, 569 F.3d 108, 112-13 (2d Cir. 2009), much like an investigating magistrate in a Continental legal system, rather than assume, as in an adversarial setting in which the plaintiff is pro se, that he is capable of providing the information that his lawyer, if he had had one, would have elicited on direct examination. Her questioning of Spiva was perfunctory; she seems not to have read his medical records.

The government's brief refers to contradictions in Spiva's testimony; the administrative law judge did not mention these. Some of them may not be contradictions: he testified that he did not drive, yet he had told one of his doctors that he did—but that was years earlier. Since he is psychotic, his inability to maintain consistency in responding to different medical personnel cannot automatically be ascribed to an intention to deceive. The government's brief intimates that the administrative law judge found that Spiva's credibility was impaired by

substance abuse. She did not; her opinion mentions substance abuse but does not relate it to the issue of Spiva's credibility.

The administrative law judge's opinion is unsatisfactory, and likewise the government's brief and oral argument, which misstate the record in several places and, worse, seem determined to dissolve the *Chenery* doctrine in an acid of harmless error. The doctrine of harmless error indeed is applicable to judicial review of administrative decisions. E.g., *Borovsky v. Holder*, 612 F.3d 917, 920-21 (7th Cir. 2010); *Parker v. Astrue, supra*, 597 F.3d at 924; *Mengistu v. Ashcroft*, 355 F.3d 1044, 1047 (7th Cir. 2004); see also 5 U.S.C. § 706; *National Ass'n of Home Builders v. Defenders of Wildlife*, 551 U.S. 644, 659-60 (2007). If it is predictable with great confidence that the agency will reinstate its decision on remand because the decision is overwhelmingly supported by the record though the agency's original opinion failed to marshal that support, then remanding is a waste of time. But that is not the government's understanding of the doctrine of harmless error, if we may judge from its brief and oral argument in this case (and not only this case—see, e.g., *Terry v. Astrue*, 580 F.3d 471, 475-77 (7th Cir. 2009) (per curiam); *Villano v. Astrue*, 556 F.3d 558, 562-63 (7th Cir. 2009) (per curiam); *Craft v. Astrue*, 539 F.3d 668, 675, 678-79 (7th Cir. 2008); S*tout v. Commissioner, Social Security Administration*, 454 F.3d 1050, 1054-56 (9th Cir. 2006); *Allen v. Barnhart*, 357 F.3d 1140, 1145 (10th Cir. 2004)). The government seems to think that if it can find enough evidence in the record to establish that the administrative law judge *might* have reached the same result had she considered all the evidence and evaluated it as the gov-

ernment's brief does, it is a case of harmless error. But the fact that the administrative law judge, had she considered the entire record, might have reached the same result does not prove that her failure to consider the evidence was harmless. Had she considered it carefully, she might well have reached a different conclusion.

The government implies that if the administrative law judge's opinion consisted of two words—"benefits denied"—a persuasive brief could substitute for the missing opinion. That is incorrect. It would displace the responsibility that Congress has delegated to the Social Security Administration—the responsibility not merely to gesture thumbs up or thumbs down but to articulate reasoned grounds of decision based on legislative policy and administrative regulation—into the Justice Department, which represents the agency in the courts. The *Chenery* doctrine "provides an assurance that the object of the court's review is the product of a body or official to whom Congress delegated authority. That constraint in turn polices the conditions for judicial deference to agency action." Kevin M. Stack, "The Constitutional Foundations of *Chenery*," 116 *Yale L.J.* 952, 1021 (2007). The Justice Department has overstepped its proper bounds.

The district court's denial of relief is reversed and the case remanded with instructions to return the matter to the Social Security Administration for further proceedings consistent with this opinion.