NONPRECEDENTIAL DISPOSITION
To be cited only in accordance with
Fed. R. App. P. 32.1

# United States Court of Appeals

**For the Seventh Circuit**
**Chicago, Illinois 60604**

Argued January 29, 2013
Decided April 19, 2013

**Before**

WILLIAM J. BAUER, *Circuit Judge*

ANN CLAIRE WILLIAMS, *Circuit Judge*

DAVID F. HAMILTON, *Circuit Judge*

No. 12-2657

| | |
|---|---|
| TALLEVETTE MUELLER,<br>*Plaintiff-Appellant,*<br><br>*v.*<br><br>CAROLYN W. COLVIN,<br>Acting Commissioner of Social Security,<br>*Defendant-Appellant.* | Appeal from the United States District Court for the Northern District of Illinois, Eastern Division.<br><br>No. 10 C 7080<br><br>Jeffrey N. Cole,<br>*Magistrate Judge.* |

**O R D E R**

Tallevette Mueller, then 48, applied for disability benefits and supplemental security income, citing primarily lower back pain, as well as hip pain, obesity, asthma, high blood pressure, and high cholesterol. The administrative law judge disbelieved Mueller's allegations about the severity of her conditions and concluded that she could still work. On

appeal she challenges the ALJ's adverse credibility finding and failure to account for her obesity and limited stooping ability. We affirm.

Mueller has reported lower back pain and other impairments, including obesity, to various physicians since at least late 2005. In fall of that year, while taking medications for hypertension and asthma, she visited a family doctor for stomach pain, loose stool, and pain in her back. Given that the five-foot, four-inch Mueller weighed 255 pounds and had high cholesterol, the doctor advised Mueller on improving her diet. The only records from the next year, 2006, do not mention back pain. Mueller did go to the emergency room three times for various ailments, including headaches, chest pain, and shortness of breath, but no doctor diagnosed her with any major complications.

By late 2007, Mueller says, her back and hip pain had worsened to a disabling point and thus she applied for disability insurance benefits and supplemental security income. She had just quit a two-year job delivering office supplies because someone had wrecked the only van she could use for deliveries (she previously worked as a home health care worker, training specialist for the disabled, and a certified nurse's aid). In October 2007 she complained to a family doctor that pain in her lower back and hips registered seven on a ten-point scale, prompting the doctor to prescribe Vicodin for pain and to order an MRI of her back and hips. Mueller later reported that Vicodin reduced her pain by 80 percent. The MRI scan of her back revealed minimal bulging of two disks in her lower back, moderate spinal stenosis (pressure on the spinal cord caused by the narrowing of either the spinal column or the openings where spinal nerves leave the spinal column) at one disk, and borderline spinal stenosis at another. The MRI scan of her hips revealed minimal degenerative changes.

In connection with Mueller's application for benefits, Dr. Robert Patey in early 2008 filled out a "physical residual functional capacity assessment" of Mueller's abilities. He opined that Mueller could stand or walk for a total of about six hours in an eight-hour work day and sit with normal breaks for the same amount of time. He further opined that Mueller could only occasionally climb, balance, stoop, kneel, crouch, and crawl. These limitations were appropriate, he wrote, because of the decreased range of movement in Mueller's lower spine and her slow gait. Dr. Patey did not examine Mueller, but he relied on findings from the report of a physician who had recently examined Mueller. That physician, Dr. Norma Villanueva, had recorded various measurements of Mueller's ability to move, including that Mueller could bend forward only 50 degrees—90 is normal—and only with pain. Dr. Patey's opinion about Mueller's ability to work is the only such report in the record from any physician.

At a hearing before the ALJ in late 2009—after a year with no change in her back condition—Mueller testified about the severity of her conditions. She testified that two years of carrying up to 50 pounds worth of paper at her delivery job aggravated her back pain to "debilitating." Moreover, Mueller said, she has difficulty standing up and sitting down and loses her balance "a lot." She acknowledged that, with frequent breaks, she cared for her mother three hours a day by doing things like washing dishes, making breakfast, sweeping floors, and washing laundry with help from others. Mueller also testified that she always needs either a cane or a walker while walking, needs the walker "a lot" for balance while getting up, and needs to elevate her legs to the waist level when they swell. Her legs swell, she said, when her feet are down for more than a couple hours.

A vocational expert then testified regarding jobs that existed in the local economy for someone with Mueller's abilities. The expert testified that a hypothetical person of Mueller's age, education, and work experience limited to light or sedentary work with only occasional kneeling, stooping, crouching, crawling, or climbing, would still be able to perform jobs available in the local economy, such as an inspector, assembler, or cashier. The expert testified, however, that no jobs would be available if this hypothetical person had to elevate her legs to the waist level or had to use a walker for balance.

The ALJ concluded that Mueller was not disabled and could perform light work as defined in 20 C.F.R. § 404.1567(b). Applying the five-step evaluation the Administration uses for determining disability, *see* 20 C.F.R. § 404.1520(a), the ALJ found that Mueller had not engaged in substantial gainful activity since the onset of her asserted disability (step one), suffered from impairments severe at least in combination—lumbar degenerative disc disease, asthma, hypertension, obesity, and high cholesterol (step two), but that these impairments did not meet or equal the criteria of an impairment listed in the agency's regulations (step three). The ALJ also concluded, adopting Dr. Patey's opinion, that Mueller could perform light work but only occasional kneeling, stooping, crouching, crawling, or climbing, and none of her past work. In explaining this conclusion, the ALJ summarized Mueller's testimony, declared some of her statements (without specifying which ones) not credible, recited the medical record, and then stated that his finding was "supported by the objective medical evidence as well as claimant's daily activities, including her caring for parents." The ALJ finally determined, relying on the vocational expert's testimony, that Mueller could perform jobs that existed in significant numbers in the economy (step five).

Mueller challenged this decision in the district court, but a magistrate judge, presiding with the parties' consent, *see* 28 U.S.C. § 636(c), granted summary judgment for the Commissioner. The magistrate judge focused on the ALJ's adverse credibility determination and acknowledged that the ALJ used "meaningless boilerplate" in explaining that Mueller's "'statements concerning the intensity, persistence and limiting effects of the

symptoms are not credible to the extent they are inconsistent with the above residual functional capacity assessment'" (quoting the ALJ's order). The magistrate judge concluded, however, that this sort of boilerplate did not necessarily invalidate the adverse credibility finding because the ALJ substantiated his decision by "reviewing Ms. Mueller's alleged symptoms and her testimony about her daily activities" and performing a "meticulous review of the medical evidence." That Mueller exaggerated her pain, according to the ALJ, is supported by a lack of objective medical evidence (her MRI showed only *moderate* spinal stenosis, for example), and conflicts between her testimony and physicians' prior observations (Dr. Villanueva had observed that Mueller was not using an assistive device, for example).

On appeal Mueller argues that the ALJ erred by not adequately explaining the adverse credibility determination. Indeed, we have repeatedly criticized the boilerplate language as "opaque," "meaningless," and "unsustainable," *e.g., Bjornson v. Astrue,* 671 F.3d 640, 645 (7th Cir. 2012); *Parker v. Astrue,* 597 F.3d 920, 922 (7th Cir. 2010), and stressed that an ALJ must offer specific reasons for disbelieving a claimant's testimony. *See Filus v. Astrue,* 694 F.3d 863, 868 (7th Cir. 2012); *Shideler v. Astrue,* 688 F.3d 306, 312 (7th Cir. 2012). The ALJ here offered no specific reasons for finding Mueller not credible. Though he recited Mueller's medical records and daily activities, he did not explain whether they were consistent or inconsistent with the pain and limitations she claimed, affording this court no rationale to review meaningfully. *See* SSR 96-7p, 1996 WL 374186, at *3–4 (July 2, 1996); *Craft v. Astrue,* 539 F.3d 668, 679 (7th Cir. 2008); *Villano v. Astrue,* 556 F.3d 558, 562 (7th Cir. 2009); *Carradine v. Barnhart,* 360 F.3d 751, 755–56 (7th Cir. 2004); *Zurawski v. Halter,* 245 F.3d 881, 887 (7th Cir. 2001).

But the absence of a rationale may constitute harmless error if the agency's decision is overwhelmingly supported by the record and thus remand would be pointless. *See Spiva v. Astrue,* 628 F.3d 346, 353 (7th Cir. 2010); *Allord v. Barnhart,* 455 F.3d 818, 821–22 (7th Cir. 2006) (applying doctrine of harmless error to error in credibility determination). That is the case here. The ALJ adopted Dr. Patey's opinion that Mueller could sit, walk, or stand for about six hours in an eight-hour workday, and Mueller has never disputed this assessment. The closest Mueller came to disputing the assessment was her testimony that she used a walker "a lot" for balance when standing up, and that she had to elevate her legs to waist level when they swelled. The vocational expert did testify that no jobs would exist for someone who needed to use a walker for balance (there would be no place to store the walker) and who needed to elevate her legs to the waist level. But Mueller did not testify that these were constant conditions. She testified only that she could balance herself by holding onto "something" —she didn't even bring a walker to the hearing—and that her legs swelled only when they were down for more than a couple hours, a situation that could be avoided in the jobs that the vocational expert described were available.

Mueller also contends that because she is obese—and obesity may affect one's ability to, for example, stand, walk, and stoop—the ALJ should have mentioned this condition when determining her residual functional capacity. *See* SSR 02-1p, 2002 WL 34686281 (Sept. 12, 2012). But any error in failing to mention obesity is harmless if the claimant did not explain to the ALJ how her obesity aggravated her condition and rendered her disabled. *See Prochaska v. Barnhart,* 454 F.3d 731, 737 (7th Cir. 2006)*; Skarbek v. Barnhart*, 390 F.3d 500, 504 (7th Cir. 2004). Mueller's mere assertion that she is obese did not satisfy that burden.

Mueller finally argues that the ALJ failed to discuss the "potential conflict" between Dr. Villanueva's finding that she could bend forward only 50 degrees and Dr. Patey's opinion that she could stoop occasionally. *See Golembiewski,* 322 F.3d at 917 (ordering remand when ALJ failed to discuss "potential conflict" between one doctor's report that claimant could bend only 40 degrees and another doctor's opinion that claimant could stoop occasionally). But Dr. Patey explicitly relied on Dr. Villanueva's finding, and thus no conflict existed for the ALJ to resolve.

AFFIRMED.