**NONPRECEDENTIAL DISPOSITION**

To be cited only in accordance with Fed. R. App. P. 32.1

# United States Court of Appeals

**For the Seventh Circuit**
**Chicago, Illinois 60604**

Submitted May 19, 2020[*]
Decided May 20, 2020

*Before*

JOEL M. FLAUM, *Circuit Judge*

ILANA DIAMOND ROVNER, *Circuit Judge*

AMY C. BARRETT, *Circuit Judge*

No. 19-2861

| | |
|---|---|
| ISAAC S. ATKINS,<br>　　*Plaintiff-Appellant*, | Appeal from the United States District Court for the Southern District of Indiana, New Albany Division. |
| *v.* | No. 4:18-cv-00193-RLY-DML |
| ANDREW M. SAUL, Commissioner of Social Security,<br>　　*Defendant-Appellee*. | Richard L. Young,<br>*Judge*. |

**O R D E R**

Isaac Atkins, who applied for disability benefits based chiefly on his complaints of hypersensitivity to chemicals and electromagnetic fields, appeals the district court's judgment upholding the denial of benefits. As the administrative law judge's and district judge's thorough and attentive decisions establish, the ALJ's ruling that Atkins was not disabled is supported by substantial evidence. We affirm.

---

[*] We have agreed to decide this case without oral argument because the briefs and record adequately present the facts and legal arguments, and oral argument would not significantly aid the court. FED. R. APP. P. 34(a)(2)(C).

In 2014, Atkins (at the time 21 years old), applied for child's insurance benefits and supplemental security income based on disability, alleging an onset date of January 29, 1993, the date of his birth. Atkins's mother prepared and submitted the applications on his behalf. Atkins, who was homeschooled through the tenth grade, had never worked and claimed he was unable to because of environmental allergies/illness, a heart condition, multiple chemical sensitivities, electromagnetic hypersensitivity, intolerance to heat and humidity, chronic fatigue, prescription drug allergies, allergy-induced sinus pressure, arthritis, sick building syndrome, and an allergy to vehicles.

Despite the alleged onset date, the medical record begins in December 2014 (after Atkins applied for benefits) when Atkins saw Dr. David Matlock, a family physician, for a physical. Atkins complained of fatigue, allergies, and feeling sick in the car but did not report any pain. He told Dr. Matlock that he went on one-hour walks daily. Dr. Matlock noted that Atkins had a "very odd, flat affect" but a normal physical examination. He recorded difficulty with interviewing Atkins because his mother and sister exhibited "bizarre" behavior and did "most of the talking."

The same month, a state-agency consultative physician, Dr. Diane Elrod, examined Atkins. His mother again led the conversation and said Atkins sought benefits because of his environmental illness and chemical/electromagnetic hypersensitivity. Dr. Elrod found no abnormal physical results but documented that Atkins had difficulty communicating with anyone other than his mother, describing his speech "like that of a four-year old boy." But she also noted that Atkins spoke fluently, could follow simple and complex directions, and had a pleasant and cooperative demeanor. She opined that he was physically healthy but "compromised socially."

A month later, in January 2015, a state-agency consultative psychologist, Gary Maryman, examined Atkins. Atkins told Dr. Maryman that he helped tend to the family's animals, including dogs and chickens; sometimes helped wash dishes; liked to read and sometimes went to the library; and did not watch television or learn to use a computer because of electric radiation. According to Dr. Maryman, Atkins's speech was "difficult to understand at times" as he tended to speak in a low volume and his articulation "showed some impairment." Nonetheless, Atkins was friendly, polite, and cooperative, "related pretty well," and displayed an unremarkable mood. Nor did he "seem to suffer" from the fluorescent lights "beaming down on him." Dr. Maryman diagnosed Atkins with "Phonological Disorder, moderate." He opined that Atkins might have some limitations in interacting with the general public but should be able to

work in a low to medium stress environment following simple to somewhat more complicated instructions.

Atkins returned to Dr. Matlock in February 2015 complaining of sinus pressure, chronic fatigue, and a rash. Dr. Matlock diagnosed Atkins with acne and allergic rhinitis and prescribed medication for both. He also provided a referral to a geneticist at the urging of Atkins's mother but advised that it was "impossible" to be allergic to "all" chemicals and that he did not believe Atkins was allergic to electricity.

Atkins then switched to Dr. Reggie D. Lyell as his family doctor. Dr. Lyell wrote letters in July 2015 and March 2016 stating Atkins could not work due to a long-undiagnosed condition involving environmental allergies. Dr. Lyell also provided referrals to several specialists. First, Atkins saw a cardiologist who observed a soft heart murmur. But an electrocardiogram and chest x-ray performed later that month were both unremarkable. He also saw a pulmonologist who found normal results other than some clubbing of Atkins's fingernails and a possible mild obstructive lung defect that could be addressed by using an inhaler as needed. The pulmonologist suggested that Atkins minimize his "allergen/antigen exposure" and "avoid exposure to dust, smoke, fumes and chemicals," but advised him to "stay active."

Atkins then saw Dr. Stuart White, an allergist and immunologist, in March 2016, September 2017, and March 2017. An allergy test came back negative other than for a moderate reaction to mold and mild reaction to dogs. Dr. White noted moderate nasal swelling and concluded that Atkins had perennial allergic rhinitis, perennial allergic conjunctivitis, and mild persistent asthma. He planned to check "immune labs," advised Atkins to avoid chemicals, preservatives, or electricity that caused him problems, and prescribed allergy medicine. At a follow-up visit, Dr. White further diagnosed Atkins with nonfamilial hypogammaglobulinemia (a condition where the immune system does not make enough antibodies). Overall, Dr. White found Atkins had minimal or no symptoms and that his conditions were "well-controlled."

Atkins visited several other providers, none of whom documented any significant conditions. Two different neurologists—one in November 2016 and another a few months later—found no evidence of a neurological disorder. One suspected that Atkins might have a connective tissue disorder, but that was ruled out by later testing. In January 2017, an oncologist/hematologist evaluated Atkins for mild polycythemia (an elevated number of red blood cells) because of an earlier blood test, but repeat testing showed an improved blood count; thus, polycythemia "was not confirmed."

Two non-examining medical doctors and two psychologists reviewed Atkins's medical records as state-agency consultants, initially in January 2015 and then again on reconsideration in April 2015. At both stages, they found "insufficient evidence" to conclude that Atkins had any severe physical or mental impairments.

At an April 2017 hearing before an ALJ, Atkins was accompanied by his mother and sister. He designated his sister as his representative after waiving his right to an attorney. Atkins testified that he had asthma, for which he used an inhaler. He also said he experienced fatigue, which he rated as a seven on a scale of ten. Whenever he was exposed to "chemicals," he felt weakness and pain and could not digest his food. He also described joint pain and said he was scheduled to see a rheumatologist soon. A vocational expert testified that a person of Atkins's age, work history, and educational background, with no exertional limitations, who was limited to no more than occasional oral communication and no exposure to dust, fumes, odors, or gases would be capable of performing jobs available in the national economy. If the same individual could not tolerate commercial building lighting, however, he would be precluded from all work.

At step one of the familiar five-step analysis, *see* 20 C.F.R. §§ 404.1520(a), 416.920(a), the ALJ recognized that Atkins had no work history. At step two, the ALJ found that Atkins had as medically determinable impairments "asthma, heart murmur, reactive polycythemia, and [a] phonological disorder," *see id.* §§ 404.1521, 416.921, but concluded that those impairments, alone or in combination, did not significantly limit his "ability to perform basic work-related activities for 12 consecutive months," and Atkins thus did "not have a severe impairment or combination of impairments." *See id.* §§ 404.1522, 416.922. Therefore, the ALJ concluded, Atkins was not disabled. *See id.* §§ 404.1520(a)(4)(ii), 416.920(a)(4)(ii). He denied benefits without addressing the remaining three steps. On appeal, Atkins argues that the ALJ erred in not formulating a residual functional capacity or considering the vocational expert's testimony, but the ALJ did not need to. *See id.* §§ 404.1520(a)(4), 416.920(a)(4); *Clifford v. Apfel*, 227 F.3d 863, 868 (7th Cir. 2000) (inquiry ends when claimant fails to meet any of the five steps).

In support of his finding of no severe impairments, the ALJ acknowledged that Atkins primarily based his application on environmental allergies and hypersensitivity but stated that "no clinical findings, diagnoses, or objective medical evidence" explained "the wide range of symptoms and limitations alleged." Further, "the exam findings and work-up we have all point to no significant limitations." In addition to the medical record, the ALJ cited Atkins's testimony and other evidence about a "relatively wide range of daily activities" including going outside several times per day, taking

hour-long walks, getting rides into town (Atkins has no driver's license), doing yardwork and other chores, and playing games with his family.

The ALJ accorded great weight to the opinions of the agency's reviewing physicians and psychologists, finding their no-impairment assessments consistent with the medical evidence. He gave little weight to the statements from Dr. Lyell that Atkins was unable to work, finding them unsupported by any clinical findings or other objective evidence. Although the ALJ remarked that the consultative physician and psychologist noted "some speech difficulties" and that Dr. Matlock noted an odd affect, he concluded that other examinations covering a broader period appeared normal in this regard: several doctors had found Atkins's mood, affect, speech, and tone to be normal. Thus, the ALJ concluded, "any underlying phonological disorder appears so mild as to cause no significant functional limitations."

Atkins sought review from the Appeals Council and submitted medical records from a rheumatologist he saw after his hearing. The records listed acrocyanosis (a vascular disorder causing blue discoloration in the extremities) as an active problem potentially related to joint hypermobility and a high level of a certain muscle enzyme, but nothing else abnormal. The Appeals Council denied review, making the ALJ's decision the Commissioner's final decision. *See Jozefyk v. Berryhill*, 923 F.3d 492, 496 (7th Cir. 2019). The district court, which declined Atkins's request for recruited counsel, upheld the ALJ's decision, determining that substantial evidence supported the conclusion that Atkins had not established a severe impairment.

On appeal, Atkins first argues that the ALJ selectively considered the medical evidence and disregarded his disabling environmental allergies and hypersensitivity to chemicals and electromagnetic fields.[1] We disagree. The ALJ acknowledged these alleged conditions, and that Atkins said they resulted in excessive fatigue, difficulty lifting, concentration and memory problems, and left him housebound. The ALJ went on to conclude, however, that there was no objective evidence that any medically determinable impairment caused those symptoms.

The record supports that conclusion. To satisfy step two, an impairment must result from "abnormalities that can be shown by medically acceptable clinical and laboratory diagnostic techniques." 20 C.F.R. §§ 404.1521, 416.921. In other words, an

---

[1] Atkins's sister prepared his appellate brief. Although non-lawyers cannot represent anyone but themselves, *Georgakis v. Ill. State Univ.*, 722 F.3d 1075, 1077 (7th Cir. 2013), Atkins also signed the brief, and we therefore consider it his submission. *See Shah v. Comm'r*, 790 F.3d 767, 768 n.1 (7th Cir. 2015).

impairment "must be established by objective medical evidence from an acceptable medical source," and a claimant's "statement of symptoms" is not enough. *Id.* The burden of proof is on the claimant at step two. *See Ghiselli v. Colvin*, 837 F.3d 771, 776 (7th Cir. 2016). The ALJ recounted the medical record in detail and concluded, correctly, that no doctor diagnosed environmental allergies or hypersensitivities or found clinical or laboratory support for them. Atkins does not point to any supporting medical evidence that the ALJ overlooked. To the extent that he cites new medical records or summaries of his ongoing treatment, we do not consider those. Records that were not available to the ALJ (or even the Appeal Board) cannot be used to challenge the ALJ's decision. *See* 42 U.S.C. § 405(g); *Stepp v. Colvin*, 795 F.3d 711, 721 n.2 (7th Cir. 2015).

Atkins also asserts that the ALJ improperly discounted his subjective complaints as "not entirely credible," a formulation this court has described as "meaningless boilerplate." *Parker v. Astrue*, 597 F.3d 920, 921–22 (7th Cir. 2010). But that is so only when the ALJ substitutes it for a full explanation of why credibility is lacking. *See Martinez v. Astrue*, 630 F.3d 693, 696 (7th Cir. 2011). Here, the ALJ "otherwise explained his conclusion adequately." *See Filus v. Astrue*, 694 F.3d 863, 868 (7th Cir. 2012). He explained that the objective medical evidence and Atkins's daily activities did not corroborate his subjective symptoms. *See Rice v. Barnhart*, 384 F.3d 363, 371 (7th Cir. 2004). Specifically, the ALJ explained that: several physical examinations showed normal results; cognitive examinations were mostly normal; the agency doctors identified no impairment; the many specialists Atkins saw found nothing other than mild abnormalities; Atkins was comfortable during his examinations and was pleasant and cooperative throughout; and there was no evidence that Atkins's alleged symptoms had ever required medical intervention. In short, no doctor had diagnosed, or even observed, the severe symptoms Atkins (or his family members) complained of.[2]

We next consider Atkins's assertion that the ALJ disregarded treating doctors who directed Atkins to remain housebound. Atkins does not identify these doctors, but we presume he means Dr. Lyell and Dr. White. Dr. Lyell wrote two letters stating that Atkins was unable to work because of undiagnosed environmental allergies. The ALJ reasonably gave these letters little weight, because they were unsupported by any clinical findings and were inconsistent with the medical evidence. *See* 20 C.F.R. §§ 404.1527(c), (d)(1), 416.927(c), (d)(1); *Elder v. Astrue*, 529 F.3d 408, 415 (7th Cir. 2008). Dr. White did advise Atkins at his first appointment not to expose himself to chemicals

---

[2] To the extent the record contains evidence of speech or social impairments, Atkins has never claimed disability based on such limitations.

or electricity that triggered his sensitivities. At later visits, though, he did not repeat that suggestion; he found Atkins's allergies and asthma were well-controlled by treatment, producing mild or no symptoms. The ALJ's conclusions, then, are not inconsistent with Dr. White's treatment records overall (much less, the entirety of the medical evidence).

Next, Atkins asserts that the ALJ did not develop a full and fair record because he did not send Atkins to an expert who specialized in his alleged conditions. The two examining consultants, Atkins reasons, lacked the correct expertise. An ALJ may order additional consultative examinations if medical evidence about a claimed impairment is insufficient. *See* 20 C.F.R. §§ 404.1519a, 416.917. Here, however, the ALJ had an adequate record: The Agency had already ordered physical and mental consultative examinations, and Atkins submitted records from specialists including a cardiologist, immunologist/allergist, pulmonologist, hematologist, and two neurologists. We see no gap in the record that the ALJ was obligated to fill. *See Nelms v. Astrue*, 553 F.3d 1093, 1098 (7th Cir. 2009); *Skinner v. Astrue*, 478 F.3d 836, 844 (7th Cir. 2007).

Finally, Atkins contends that the district court abused its discretion by denying his request for recruited counsel on the ground that he had not demonstrated a good-faith effort to hire counsel. Atkins says he was unaware of such a requirement. The order denying the motion for counsel, however, informed him that he needed to make reasonable attempts to obtain counsel independently. Armed with that explanation, Atkins never filed a renewed motion. (He has now provided correspondence with several attorneys, but it is all dated after the district court's denial of his request.) The court did not err. *Pruitt v. Mote*, 503 F.3d 647, 654 (7th Cir. 2007) (en banc).

Atkins's other arguments require little attention. Many of his claims—for example, that an identity thief has been drawing from his parents' Social Security benefits and that the Agency did not produce a certain form after his initial denial, among others—are beyond the scope of this appeal under 42 U.S.C. § 405(g), which limits our review to the ALJ's substantive decision denying benefits. We have considered Atkins's remaining arguments, including a challenge to the ALJ's characterization and weighing of Atkins's daily activities, and none has merit.

AFFIRMED